IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

SHERYL CLAYTON,                          )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )    CIVIL ACTION NO. 16-0169-MU
                                         )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social            )
Security,                                )
                                         )
          Defendant.                     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Sheryl Clayton brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for Supplemental Security Income ("SSI"), based on disability. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 30 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, … order the entry of a final judgment, and conduct all post-judgment proceedings.")). Upon consideration of the administrative record, Clayton's brief, the Commissioner's brief, and the arguments of counsel at the May 10, 2017,

hearing before this Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[1]

## I.  PROCEDURAL HISTORY

Clayton applied for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on June 14, 2012. (Tr. 16). Her application was denied at the initial level of administrative review on September 25, 2012. (Tr. 109-10). On October 15, 2012, Clayton requested a hearing by an Administrative Law Judge (ALJ). (Tr. 118). After hearings were held on November 20, 2013, and April 20, 2014, the ALJ issued an unfavorable decision finding that Clayton was not under a disability from the date the application was filed through the date of the decision, November 14, 2014. (Tr. 16-41).  Clayton appealed the ALJ's decision to the Appeals Council, which denied her request for review of the ALJ's decision on March 2, 2016. (Tr. 1-3).

After exhausting her administrative remedies, Clayton sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on September 8, 2016. (Docs. 15, 16,17). After both parties filed briefs setting forth their respective positions, the Court conducted a hearing on this matter on May 10, 2017. (Docs. 19, 26). The case is now ripe for decision.

---

[1] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 30. ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

## II.  CLAIMS ON APPEAL

Clayton alleges that the ALJ's decision to deny her benefits is in error for the following reasons:

1. The ALJ erred in assigning weight to the medical opinions in the record; specifically, by failing to give adequate weight to the opinion of Dr. Goff; and

2. The ALJ's reasons for finding Clayton's testimony to be only partially credible are not supported by the evidence because the ALJ misrepresented testimony and evidence.

(Doc. 19 at p. 1).

## III. BACKGROUND FACTS

Clayton was born on June 17, 1966, and was almost 46 years old at the time she filed her claim for benefits. (Tr. 77-78). Clayton alleged disability due to pain and arthritis in both hands, headaches, and pain in one of her legs. (Tr. 261, 267, 280). Clayton completed either the tenth or the eleventh grade in high school and did not attend special education classes. (Tr. 262).[2] She has never worked. (Tr. 261). She engages in normal daily activities such as personal care, cooking meals, housework, taking walks, watching television, and reading. (Tr. 282). She has raised her children and now takes care of a granddaughter.  (Tr. 23, 24, 285). After conducting two hearings, the ALJ made a determination that Clayton had not been under a disability during the relevant time period, and thus, was not entitled to benefits. (Tr.16-41).

_____

[2] Clayton indicated in various documents and testimony that she completed the tenth grade and in others the eleventh grade, after which time she dropped out of school due to pregnancy. No school records are contained in the transcript.

# IV. ALJ'S DECISION

After considering all of the evidence, the ALJ made the following relevant findings in his November 14, 2014 decision:

**1. The claimant has not engaged in substantial gainful activity since June 14, 2012, the application date (20 CFR 416.971 *et seq.),* nor does it appear that she has been gainfully employed anywhere in the last 15-16 years for pay. Exhibit 5 D**.

**2. The claimant has the following severe impairments: a history of a post concussive syndrome, after a motor vehicle accident in 1993 (Exhibit 6 F, P. 1-2); a recent headache disorder, after a laceration to the head sustained while breaking up a fight in June 2012 (Exhibit 1F, P. 5, Exhibit 9 F, P. 19, 15); cognitive disorder and borderline intellectual functioning; some question of depression; and a history of arthritis (wrist, leg/knee?), but no real objective evidence of the same (20 CFR 416.920(c)).**

These impairments are established by the medical evidence and are "severe" within the meaning of the Regulations because they significantly limit the claimant's ability to perform basic work activities, as it would seem that they have more than some minimal effect on the claimant's ability to perform basic work activities (20 CPR 404.1520(c), 20 CFR 416.920(c); *Brady v.Heckler*, 724 F.2d 9114 (11th Cir. 1984); *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986)).

The undersigned notes that the claimant has nonsevere impairments of hypertension and tobacco abuse. In review of the treatment record, these issues and or impairment[s] appears to be effectively treated and not a severe impairment within the meaning of the Social Security Act.

**3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 416.920(d), 416.925 and 416.926).**

The claimant's impairments, individually or in combination, do not meet or medically equal the criteria for any listed impairment. The medical evidence of record fails to document clinical findings of any physician that suggest the claimant's impairments satisfy the severity requirements contained in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). …The medical expert, Dr. Johns, testified the claimant did not meet or equal any listings physically. The psychologist medical expert, Dr. McKeown, testified the claimant did not meet or equal any of the mental listings. It is very questionable whether she has any depression severe enough to be an impairment, as she has consistently denied depression in her family doctor treatment (clinic) records, and also in most of the consultative examinations, but it is considered in an abundance of caution under 12.04.

The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.02 and 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. …

In activities of daily living, the claimant has only a mild restriction. In a Function Report-Adult, dated August 5, 2012, the claimant indicated that she can attend to her personal needs independently. She can do laundry, prepare meals, wash dishes, and iron (Exhibit 6E). The claimant has had 4 children, and she testified that she can do simple math and read and write some, she has a home phone and has had no problems using it. Presently she gets $614 in food stamps per month, and she grocery shops with her daughter's help. She has had no mental health treatment her entire life. She does her housework with her daughter's help. In her Function Report, she related that she could cook breakfast, make her bed, take a bath, get dressed, do housework, cook dinner, and that she watches TV and does a little reading. Exhibit 6 E, P. 1. She claimed to, "do everything for my children." Exhibit 6 E, P. 4. She did not need reminders to take care of her personal needs or grooming, and she could fix sandwiches, snacks and complete meals on a daily basis. She indicated that she was able to clean, do laundry, iron and do dishes, and that she did these things 2-3 hours, daily. She would go out every day and walk, and would shop in stores for food and

household items, and it took her up to 2 hours. She indicated that she could pay bills, count change, handle a savings account, and use a checkbook and money orders. She indicated that she read, and watched TV, every day, <u>very well</u>. Exhibit 6 E, P. 4-7.

In social functioning, the claimant has mild difficulties. In the afore-mentioned function report, the claimant indicated that she spends time with others and shops in stores (Exhibit 6 E, P. 7, 8, 9). She went to stores and doctor offices on a regular basis weekly, and played games with others, and conversate(d) with them. She indicated there had been no changes in her social activities since her (disabling) condition began, and that she got along well with authority figures.

With regard to concentration, persistence or pace, the claimant has no more than moderate difficulties. The claimant indicated in the afore-mentioned report that she has problems memorizing and concentrating. However, she indicated she can walk a half mile before having to stop and rest, and enjoys watching television and reading, shops in stores for food and for household items, and has conversations and plays games with others. (Exhibit 6 E, P. 6, 7, 8). She indicated that she could finish what she started, and could follow written instructions, such as a recipe, "very well".

\* \* \*

**4.   After careful consideration of the entire record, the undersigned finds that this now 48 year old claimant with nine to ten years of education, who is assessed as Borderline Intellectual Functioning, has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except she can sit for six hours total and for one to two hours without interruption during an 8 hour day. She can stand and/or walk for six hours total, and stand and/or walk for thirty minutes to one hour without interruption. She will need a sit/stand option which takes into account all allowed work breaks, and which allows a change of position while remaining at her work station, with no loss of productivity, occasionally during the day for up to 5 minutes. She can frequently lift, carry, push, and/or pull ten pounds, and occasionally up to twenty pounds. She**

can frequently grasp and fine manipulate bilaterally with her hands. She can occasionally use her feet for repetitive movements bilaterally. She can frequently bend, stoop, crawl, climb stairs, use ladders, ropes, or scaffolds, crouch, kneel, and balance. She is assessed with mild to moderate pain which does not cause her to abandon task or the work station, and here mild and moderate are specifically defined as conditions that do not prevent the satisfactory completion of work. However, due to her mental issues, and due to her pain issues, I find that, as regards her concentration, persistence and pace, she is limited to simple, unskilled, repetitive and routine work, in jobs that have no responsible or regular general public contact, any that occurs should be brief and superficial, in jobs where she works primarily alone, in jobs that require little independent judgment, with only routine changes and with no multiple or rapid changes. Compare, see also, Exhibit 13 F, P. 7-8.

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

* * *

For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

In her initial application documents, the claimant initially alleged that her ability to work was limited only by her hands, headaches, and right leg problems. She reported her height as 5'3" and her weight as 114 pounds. She reported she had never worked, and, around August 4, 2003 alleged that her condition became severe enough to keep her from working (Exhibit 2 E). This Disability Report-Adult-Form SSA-3368, received June 26, 2012, was filled

out by her attorney, Exhibit 2 E, P. 1-2, 3, and it reports that the claimant can speak, read and understand English, and that she can write more than her name in English, and that she has an 11th grade education, completed in 1983. Requested to list all physical and or mental conditions that limited her ability to work, the claimant indicated only both hands, headaches, and right leg as issues. Exhibit 2 E, P. 2, Section 3.

It appears that she lives in an apartment. On August 5, 2012, in a Function Report form she filled out, the claimant described her typical day as waking up, cooking breakfast, making her bed, taking a bath, getting dressed, doing housework, picking out dinner for the night, watching television, taking a walk, cooking and eating dinner, reading a little, then going back to sleep. She reported she lives in an apartment with family caring for herself, children, and grandchildren. She reported she can attend to her personal care independently, although it is hard to button her blouses and jeans and comb her hair. She can prepare meals, clean, iron, perform laundry duties, and wash dishes. She shops in stores and can handle financial obligations. She enjoys watching television and reading every day. She spends time with others and goes to the doctor and stores on a regular basis. She reported that her impairments affect her ability to lift, squat, stand, reach, walk, sit, kneel, stair climb, memorize, concentrate, and use her hands. However, she reported she can walk half a mile before needing to rest. She can pay attention for about a half hour, and can follow written instructions (such as a recipe) very well, and spoken instructions, "pretty good" (Exhibit 6 E, P. 1, 10, 2, 4-9).

On August 5, 2012, the claimant also completed a Pain Questionnaire. There, she reported that her pain began around October 1993 in her head, hands, arms, and left leg. She reported she has pain every day and activities of daily living exacerbate the pain. She reported she takes prescribed pain medication (Dr. Carlisle) and the side effects are insomnia. She reported that sleep relieves the pain and around June 1994 the pain started to affect her activities. She described her daily activities as walking, shopping, household chores, and socializing. Asked to describe whether there were any changes to her activities

since the pain began, she indicated, "none" (Exhibit 5 E, P. 2-3). On August 5, 2012 the claimant completed a Work History Report, and she responded by writing "does not apply" as her answer (i.e., no work history to report). Exhibit 4 E, P. 1-10.

<u>On August 6, 2012 she completed</u> (hand wrote) a Hand Questionnaire, which she received sometime after July 25, 2012. Exhibit 7 E, P. 1, 2-3, 4. She reported that with her hand pain it is hard to button up her blouses, tie her shoes, and button her jeans. She reported she has a hard time styling her hair and using eating utensils. She reported she had to cut her hair so it is easier to manage. She can prepare meals with help. She reported that when cooking she has a hard time dealing with pots and pans and stirring for a significant amount of time. She reported her hands constantly ache and give out randomly. She does not drive, and in her spare time she watches television and reads. She further reported she is right handed and has difficulty writing, typing (her wrist and fingers lock up on me), and sometimes grasping and turning a door knob (Exhibit 7 E).

On a Disability Report-Appeal, received October 17, 2012, the claimant reported that around July 10, 2012, her left leg gave out while hanging a picture. Her medications were Aleve for pain, Orbivan for head pain, and Tylenol for pain. She complained her headaches were worse, a 9 or 9 and 1/2. <u>This report was completed by the claimant on the internet, using a computer</u>, apparently from her attorney's office (Exhibit 9 E, P. 1-6). On September 5, 2013, the claimant completed her list of medications, See, Exhibit 11 E, which is hand written. On her original application, dated June 26, 2012, the claimant reported owning a 1995 Nissan Quest and a 1995 Nissan 240 (vehicles), and she indicated that she had a checking account and a savings account with the Navy FCU (Federal Credit Union). Exhibit 1 D, P. 2. On June 26, 2012, the claimant was interviewed in connection with her application (Disability Report-Field Office-Form SSA- 3367) by J. Wesson, and this form indicates that it was a tele-claim interview with the claimant, and that the claimant had no difficulty with

hearing, understanding, coherency, concentration, talking or in answering as the interview was conducted. Exhibit 1 E.

The claimant's first hearing was scheduled for November 20, 2013. On November 7, 2013, less than two weeks before the hearing, the claimant was seen by John R. Goff, a neuropsychologist, upon referral by the claimant's attorney, Exhibit 11 F, P. 1, for a consultative examination. The report was transcribed November 11, 2013 and Goff signed the medical source opinion (mental) of claimant's residual functional capacity assessment November 12, 2013 (Exhibit 11 F, P. 7, 9), and, apparently, this exhibit was added to the file shortly just before the hearing. After this first hearing, another psychologist consultative examination with IQ testing was obtained by the administration, on April 7, 2014, after a neurologist consultative examination was first obtained January 8, 2014, Exhibits 12 and 13 F.

At the first hearing, held on November 20, 2013, the claimant testified that she was 5'3" tall and weighs between 112-115 pounds. She testified she is married with four children, ages 30, 28, 22 and 17. She has lived in the Demopolis, AL area since July, 1995. Contrary to her earlier report, she testified that she had dropped out of the 10th grade. She testified she is right handed, and can read, write, and do simple math. She has a telephone at home, and did not have problems using it unless she forgot a number, and then she would ask one of her children to give her the number. She testified that her 22 year old daughter and her daughter's child (her granddaughter) lived with her. She currently gets $614 per month in Food Stamps. When she was raising her children, if they were sick, she would get her mother-in-law to take she and the child to the doctor, and she (the claimant) would give them prescription medications as necessary. She had a bank account and used a debit card to obtain money or spend money in the account. She later admitted to writing checks on the account, but indicated that after 2002 hand problems prevented her from gripping a pen. With it (the bank account) she

bought things for the house and clothes, for example. One of her children drew social security payments on her father's account, as much as $585 per month, which she controlled since 2002, for roughly 8 years. She does not have a driver's license; however, she took the test and failed it and was too embarrassed to try again. She testified she has never worked and cannot work due to her hands, left leg, and headaches. She testified she has headaches four times a week and has to lie down, take medication, and have quietness. She testified she has trouble walking due to poor circulation and her left hip has inflammation due to a slight hip fracture. She testified she was in a motor vehicle accident and she was the only one to survive. She testified that the pain in her right wrist and elbow stems from the accident and has continued to have pain in her right elbow, a 9, but her wrist is fine right now (at the time of the hearing). She testified she has high blood pressure. She testified she goes to the restroom about seven times a day and her medication makes her drowsy.

Regarding her activities of daily living, she testified she grocery shops, cooks, and does housework, with the assistance of her daughter. She testified that her daughter assists with buttoning her clothes. She testified she can brush her hair, but cannot use curling iron. She can wash dishes with her daughter's assistance and has to lie down about three hours a day. Regarding her physical abilities, she testified she can not carry anything too heavy because her hands give out. She testified she can grip a half gallon of milk with her right hand, but has to use her left hand for assistance. She testified she can stand, but after ten minutes she has to move around. She testified when sitting she has to move around.

Dr. Calvin Johns, a medical expert, testified at the first hearing held November 20, 2013, that, after reviewing the entire record, the claimant did not meet or equal any of the listings. He noted complaints and medical issues concerning hypertension, headaches, a contusion on one of her feet, a post concussive syndrome, some vertigo, a history of a wrist fracture, and a partial pancreatectomy. See, Exhibit 4 F, P. 14-16; 3 F; 5 F, P. 16, 2-3.

At the August 20, 2014, hearing, which was a continuation of the November 20, 2013 hearing, the claimant testified she has four adult children, and she lives with her eighteen year old, twenty-two year old and a granddaughter. She has never had a driver 's license and does not drive. She testified she took the GED test twice, but could not pass it. She again testified to no mental heath treatment. She testified she still has headaches about four times a week. She testified she lies down five to five and a half hours during the day. She takes fluid pills for high blood pressure, which makes her go to the restroom about eight to nine times a day. She cannot button her blouse or jeans, tie her shoes, or fix her hair because of hand pain. She testified she takes an antibiotic shot because she does not have a spleen. Regarding her physical abilities, she testified that she can lift only a five pound bag of potatoes. At this hearing, she was wearing two wrist splints, and she testified she has worn them every day for the past twenty years, off and on. Regarding her activities of daily living, she testified she and her daughter do the household chores.

After reviewing the file exhibits and hearing the claimant testify, Dr. Doug McKeown, a psychologist medical expert, testified at the second hearing that the claimant had been in a tragic car accident, where people were killed. She had attended a consultative psychological examination in September 2012 and there was no indication of a mental health disorder at that time, as the assessment was for a pain disorder. See, Exhibit 2 F, P. 3, 2, by Dr. Tocci, a psychologist, who thought she was within the average range of intellectual ability. Dr. Mckeown noted she had a recent IQ score of 63 that was not valid for considerations of mental retardation.

Exhibit 11 F [Dr. Goff, indeed, stated there that, "I do not think that this lady is mentally retarded." at P. 4]. For a functioning issue related to a cognitive disorder secondary to head trauma, the issue is not mental retardation. He indicated that Goff 's mental RFC had no marked impairments in the areas of adaptive living skills which were significant which would be related to cognitive functioning

related to a head injury, although there were indicated a number of marked impairments for work activities. Exhibit 11 F, P. 8-9. He noted that Dr. Reynolds consultative examination found a retest IQ of 75, with a RFC assessment with only minimal limitations, and functioning in the Borderline IQ range. Exhibit 123 F, P. 4-5. He indicated these IQ scores would have been elevated by a practice effect, though the amount of increase was not specified. He noted Dr. Goff's response to Dr. Reynolds, Exhibit 14 F, indicating criticism of his IQ results due to practice effect, but Dr. McKewon [sic] did not find any reason to conclude that her functioning assessment was a result of the retest. He testified that the achievement testing (WRAT-III) was worth noting, and that it indicated she read at a 6th grade level, and that overall she is functioning in the borderline (IQ) range, so that her functioning level would not meet the requirement for mild mental retardation; and, the evidence did not show that she was mentally retarded prior to the age of 22. He testified that she had alleged some depressive symptoms; however, they are not being treated. Dr. McKeown opined that there may have been some decline of function since, 1993, but not as significant as Dr. Goff indicated, but perhaps more than as indicated by Dr. Reynolds. Overall, Dr. McKeown testified that the appropriate listings to be considered were 12.02 and 12.04, and that according to listing 12.02 and 12.04 the claimant does not meet or equal the requirements of the listings. As to the "B" criteria, Dr. McKewon [sic] found only mild limitations in activities of daily living and in social functioning, moderate limitations regarding concentration, persistence and pace, and no episodes of decompensation demonstrated by the record. He gave her "marked" limitations for the performance of complex tasks, but only "mild" impairments or limitations regarding the performance of simple tasks, with mild to moderate limitations regarding social functioning and as regards concentration, persistence and pace. Both Dr. Reynolds and Dr. Goff employed forms which defined "mild" as, "There is a slight limitation in this area, but the individual can generally function well.", Exhibit 13 F, P. 7 and Exhibit 11F, P. 8.

When Dr. McKeown was cross-examined by the representative as to his familiarity with other tests, he testified that the claimant had been administered several

test, by Dr. Goff in particular. He was not familiar with a Victoria validity test, was familiar with the WAIS- Fourth, was familiar with the Ratan Indiana phasing test (and for which in Mckeown's own assessment he did indicate some limitations in that area), a trail making test he was familiar with (which she did not score well on, impaired by pain?), a Wexler memory test he was familiar with, and a grooved pegboard test he was familiar with. When asked about the claimant's coma, Dr. McKeown referred to the consultative report by Dr. Freij, a neurologist, and indicated he had considered it in giving her marked limitations re complex tasks, and at least "mild" as to simple tasks.

The medical evidence at Exhibits IF and 3F-8F is well outside the claimant's amended alleged onset date of June 14, 2012, but it has been reviewed and taken into consideration by the undersigned, particularly for the purpose of understanding the claimant's medical complaints and for assessing credibility. This evidence includes records from North Carolina Department of Human Resources Emergency Medical Services, Fitzgerald and Perret, Nash General Hospital, Sentara Norfolk General Hospital, Southeastern Neurology Group, Portsmouth Orthopedic Associates, and Nathan Goldin, M.D.

On August 15, 1993, North Carolina Department of Human Resources called the ambulance services due to a motor vehicle accident involving two subjects pinned in a vehicle (Exhibit 3 F). On arrival at Nash General Hospital on August 15th, the claimant (Sheryl Boone) suffered from multiple left sided rib fracture with left hemopneumothorax, splenic laceration, blunt pancreatic transection, multiple abrasions and contusion, possible left scaphoid fracture, and possible sacral and left acetabular fracture. She was admitted and underwent surgery due to internal bleeding. An x-ray of the left hand indicated a questionable scaphoid fracture. She underwent a laparotomy, which revealed a hilar tear of the spleen and she had a blunt pancreatic transection in the mid portion of the pancreas. Post operatively she was described as having a level of consciousness that was "quite blunted", but a CT scan of the head was negative, with no hemorrhage present, no lesion seen, and no skull fracture. On the 24th she was

alert and oriented. She was discharged on the request of family and transferred to Sentara Norfolk General Hospital on August 24,1993, in stable condition (Exhibit 4 F, P. 7, 9, 14-16, 9). While at Sentara Norfolk General Hospital, she had a computed tomography (CT) of the head, which was unremarkable. A CT of her abdomen showed multiple rib fractures and postoperative changes in the abdomen splenectomy and distal pancreatectomy. At discharge, she was ambulating without difficulty and was tolerating a regular diet. She had a psychiatric consult, which indicated that she was reasonably stable but she was to follow up as needed. She was discharged on September 14, 1993, in stable condition (Exhibit 5 F, P. 2-3, 10), about 30 days after the accident. These reports do not reflect that the claimant was in a coma for some number of days; they only indicate that she was at a level of consciousness that was "quite blunted", meaning being slow in perception or understanding, but not suffering a total loss of consciousness.

November 11, 1993, she was treated at Portsmouth Orthopedic Associates with complaints of her right wrist weakness and pain. Exhibit 8 F, P. 1, 2. On October 6th X-rays showed a right wrist distal radius fracture which was healed. It was noted she was given an AOA wrist splint and she reported it had improved her pain. On October 15th, she saw Dr. Lannik, and denied any symptoms at that time, no numbness, no tingling, etc. On November 3d, she saw Dr. Wardell, and noted that her right wrist was sore, but improved. She had Jamar grip strength testing of 50 pounds left and 40 pounds right. X-rays of the right forearm showed the distal radius fracture had healed. She was advised to continue the strengthening program. On November 11th, the orthopaedist, Dr. Wardell, opined that she was recovering from her right wrist fracture and no permanent physical impairment was anticipated. On April 27, 1994, the same doctor noted complaints of right wrist weakness, but no pain complaints. EMG and nerve conduction velocity studies had recently been done, which were negative (Exhibit 6 F, P. 3, 4; no evidence of compression or entrapment neuropathy, underlying neuromyopathy, right sided brachial plexopathy, or of cervical radiculopathy). Dr. Wardell opined that the claimant had sustained a distal radius fracture, which was

healed; however, there was no permanent physical impairment anticipated, even though aching in the right wrist would continue (Exhibit 8 F, P. 3, 1). On November 16, 1993, she saw a D.O., David Biondi, at Southeastern Neurology for headaches. As past medical history, the claimant reported being in a coma for 5 days, awoke confused after a MVA on August 15th, which lasted for 4 weeks. See, Exhibit 6 F, on P. 1, before the examination notes. She reported chronic headaches in her frontal periorbital area that was associated with dizziness. She was examined and assessed with post concussive syndrome, with the headaches a major component of the post concussive syndrome, and Ibuprofen and Elavil were prescribed (Exhibit 6 F, P. 1, 2). She had no pronator drift, her muscle strength was rated 5/5 and she had normal muscle tone, a normal gait, which was not ataxic. She was to follow up in 3 weeks, but no other notes from this provider are of record. It appears the doctor's reflection of a concussion was based solely upon the claimant's report, and is not borne out by the existing medical records.

As previously noted, on March 14, 1994, the claimant had undergone a EMG/nerve conduction study of the right upper extremity. Dr. Rahman noted that the study was within normal limits, without any electrophysiologic evidence of a compression or an entrapment neuropathy, underlying neuromyopathy, right-sided brachial plexopathy, or cervical radiculopathy (Exhibit 6 F, P. 4). March 25, 1994, she saw Nathan Goldin, MD for a follow up of her abdomen. He noted that she was a 27 year old black female, status post a motor vehicle accident, who had a history of 3 vaginal deliveries, complaining of an increasing stress type urinary incontinence over the last year. He noted that, at that time, she took no long term medications. Her urinalysis was normal, no flank tenderness, normal abdomen and pelvic exams. Her examination was unremarkable, except she had a mildly positive Marshall test indicative of mild stress incontinence. She was started on Kegal exercises, which with her mild symptoms were expected to improve her voiding over the next 6 months (Exhibit 7 F). April 27, 1994, she had an unremarkable examination of her wrist; there was a negative Tinel's test, and full range of motion. Her grip strength was fifty pounds on the left and only fifteen pounds on the right. She was

encouraged to do right wrist strengthening exercises (Exhibit 8 F, P. 3).

There are no medical records of record after the Spring of 1994 until March of 2008. She was treated at Fitzgerald and Perret (clinic) from March 2008 to May 14, 2008. These visits included complaints about her blood sugar, shortness of breath, dizziness, and an itchy throat, with a diagnosis history of arthritis listed, but they do not list any headache complaints. She was assessed with hypertension, positional vertigo and treated with medication management (Exhibit IF, P. 17, 14-15, 12). Exhibit 1 F also includes visits on June 15, 2012, June 6, 2012, August 30, 2011, as well as the May 14, 2008, April 1, 2008 and March 19, 2008 visits. On August 30, 2011 the claimant's complaint centers upon right foot pain after she hit her foot on a chair. She had no headache, no facial pain and no sinus pain, no anxiety, no depression and no sleep disturbances, a normal back, and she was oriented to time, place and person. She was assessed with a foot contusion and hypertension. Exhibit 1 F, P. 9-10, 11. She has no visits of record until June 6, 2012, when she reports injuries to her right arm and head after trying to break up a fight the previous Sunday. Exhibit 1 F, P. 5. On that visit she had no headache, facial pain or sinus pain, no neck pain, stiffness or swelling. She also had no joint pain, muscle aches, or joint stiffness. Exhibit 1 F, P. 7. On June 15, 2012, the claimant had a normal musculoskeletal exam except for right foot edema, with a normal gait and stance, normal back, no anxiety, no depression and no sleep disturbances, no vertigo, no dizziness, and no headache, no facial pain and no sinus pain. Exhibit 1 F, P. 2-4. Her chief complaint had to do with the removal of staple(s) from her head, and she was oriented to time, place and person, and was in no acute distress. At that time, she was noted to have had a laceration to the head, which was well healed, a contusion to the foot with intact skin surface, and hypertension. Exhibit 1F, P. 4. From the above it is apparent that the claimant had no headache complaints and no depression that was treated by medical care professionals that are of record from the Spring of 1994 through the middle of June 2012.

After careful consideration of the evidence, the

undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause only some of the alleged symptoms; moreover, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. In general, I do not find this claimant's complaints to be credible, as has already been demonstrated above in the discussion of the medical records, and which will be addressed further below. In that connection, I observe that the reports of her presentation for doctor and other visits reflect inconsistencies with her now made contentions of disabling conditions, and these are noted and are of consequence in assessing her overall credibility.

As previously indicated, on August 30, 2011, she presented to Fitzgerald and Perret with complaints of right foot pain after hitting it on a chair. Physical examination indicated her blood pressure was a little elevated and she had some edema on the lateral aspect of her right foot. She was assessed with newly treated hypertension and a contusion, with intact skin of the foot. Consequently, she did not return until June 6, 2012, some ten months later, with complaints of an injury to her head and right arm. She reported she was trying to break up a fight and sustained a laceration to her head and right arm. It was noted she had staples intact to the scalp, with no evidence of infection and an abrasion to the right arm, which was healing. She was treated with prescribed medication. She returned June 15, 2012, to have the staples removed from her head, which she tolerated well, as 17 staples were removed (Exhibit 1 F, P. 4). She returned a month later, on July 12, 2012, with complaints of a headache and follow up of her staple removal. She complained of a right temporal headache at the staple site, after an altercation the previous June 4th.but she had no other symptoms, was only taking a blood pressure medication (Lisinopril). She had <u>no depression</u>, anxiety or sleep disturbance, no dizziness or vertigo. Her physical examination was unremarkable and she was assessed with hypertension, headache

syndrome, and nicotine dependence (Exhibit 9 F, P. 19, 21), but no headache medications were prescribed at that time.

At the request of the Disability Determination Services, she underwent a consultative examination on September 11, 2012, conducted by Nina Tocci, PhD, a psychologist. When asked why she was disabled, she reported a bad car accident in 1993 with various physical injuries. Exhibit 2 F, P. 1. She reported being in a coma for 12 weeks. This is certainly not true. She reported receiving counseling secondary to depression in 2007 [no record of this, either]. She reported being separated from her second husband of 18 years, and she had a son by that marriage, who she reported was then age 16. Her first husband of 9 months was killed in the car accident, and she had a then 20 year old daughter by that relationship. She denied any work, military or legal history. She reported that she left school from the 11th grade secondary to pregnancy (the daughter). [If her son was 16 years old in 2012, this means he was born approximately 1996, about 3 years after the car accident] Her posture and gait were normal and her motor activity was unremarkable. In her mental status examination, she had good eye contact, responsive facial expression, and a cooperative attitude, and she spoke without impediment. Her affect was appropriate, normal, and stable and she described her mood as, "just in a little pain". She demonstrated thought content appropriate to mood and circumstances and a logical thought organization, and was oriented to time, place, person and situation. She was able to name the president and immediate past president of the United States. She evinced good social judgment in her consideration of two social dilemmas and she demonstrated some insight into her behavior. She did report her "pain" as an 8 on a scale of 10, due to her previous injuries. She reported rearing two children, one from each of her marriages. In general, Dr. Tocci noted that she appeared to be functioning in the average range of intelligence, ability. She noted that the claimant could prepare meals and complete housework, and that she had friends with whom she talked. Her diagnostic impression was only: a pain disorder, with a global assessment of functioning score (GAF) of 60. (footnote omitted). Dr. Tocci opined that the claimant appeared to have the cognitive ability to engage in work-

related activities (Exhibit 2 F, P. 2-3), but that her ability to engage in physical activities would have to be evaluated by a physician. The undersigned finds Dr. Tocci's assessment and opinion quite interesting, as of the time it was rendered, and in many aspects it is consistent with much of the other evidence, when considered as a whole.

Four months later on November 26, 2012, she returned to Fitzgerald and Perret for a follow up on her headaches. She reported that the headaches were on the right side, where she had 22 staples after breaking up a June 2012 altercation. She further reported that she has been having headaches since her 1993 motor vehicle accident, with treatment by Dr. FG since 1995, the year she moved to the area. She had an unremarkable physical examination, no anxiety, vertigo, depression or dizziness, and no muscle aches, no localized joint pain, and no localized joint stiffness, no facial pain and no sinus pain. She was assessed with a headache syndromes [sic] and prescribed Topomax 25 mg twice a day, which is a starting dose (Exhibit 9 F, P. 15-18), for a trial period. It is interesting that although she reported headaches since her accident in 1993, there is no record of her seeking any medical treatment for any headaches for some 18 or 19 years, and it would appear from the record that she got no medical treatment for headaches prior to, or as a result of, the June 2012 altercation, with a head injury which required some 17 to 22 staples to close.

January 4, 2013, she returned to Fitzgerald and Perret with complaints of arthritis pain in her hands, headache on entire right side where staples were a few months ago, and pain in her left knee, after falling yesterday. However, her review of systems indicated no (current?) headache, no facial or sinus pain, no neck pain, no muscle aches or joint pain, and no depression or anxiety. Her back was normal, overall musculoskeletal system was normal, and her gait and stance was normal. Again, her physical examination was unremarkable, but her left knee was treated/wrapped with a three inch ace wrap. She returned January 21, 2013, for vaginitis and a pap smear, which was normal, and on January 28, 2013, she had a pelvic ultrasound, which was unremarkable (Exhibit 9 F, P 11-14, 7-10, 4-6).

Four months later, on May 31, 2013, she returned to Fitzgerald and Perret for a follow up of her headaches, which she reported had resulted from her hitting her head against a door jam during an altercation. She reported she was not feeling any better. No other symptoms reported. Review of systems noted that her headaches were over the right temple, with no facial or sinus pain. Her physical examination was unremarkable, with no joint pain, no muscle aches, no anxiety, no depression, normal gait and stance, a normal routine physical and history; she was prescribed Fioricet for her headaches. Fioricet is a barbiturate and pain reliever combination, prescribed for tension headaches. It is not recommended for recurrent or multiple headaches. The Pill Book, 15th Edition, Page 501-502. Five months later on October 3, 2013, she returned for a follow up on her headaches. She had no anxiety, depression and no sleep disturbances, no dizziness or vertigo, no neck symptoms/pain. She reported that the headache medication was not working and she complained of arthritis in her arms. She had a normal physical examination, was treated with medication management (Exhibit 10 F, P. 6, 7-8, 9; 2-5), and she was to be referred to a neurologist in Tuscaloosa; she was prescribed medications: meloxicam for knee joint pain and ketorolac tromethamine. Her visit on October 24, 2013, was for a transthoracic echocardiogram, which indicated a good pump but a leaking tricuspid valve, not physiologically important, ejection fraction of 59 % (Exhibit 15 F, P. 8, 9-10, 6), although Head Injury, NOS was listed as an active problem, there was no mention of headaches as an issue in this note.

At the request of the claimant's attorney, she underwent a psychological evaluation on November 7, 2013, just before our first hearing, conducted by John Goff, PhD. Dr. Goff noted that the claimant was pleasant and cooperative, but somewhat garrulous (excessively talkative). She reported being born in Portsmouth, Virginia and grew up there, and had not ever been treated for any sort of mental or emotional difficulties. However, she did not appear apprehensive or anxious. She related being in pain a good deal of the time, and that the principal problem is <u>headache</u>. <u>She denied being depressed</u>. Dr. Goff administered several psychological assessments to the claimant; specifically the

Wechsler Adult Intelligence Scale (WAIS-IV), where she obtained a full scale IQ score of 63. Dr. Goff noted that this score fall within the mildly retarded range of psychometric intelligence. However, he opined that he did not think she was mentally retarded, but that this represented a decline from previous levels of function, which were not specified. Her handwriting was readable, she was able to read a sentence at least at the 5th grade level, and she was able to perform simple math calculations on paper. She was able to provided personal and current information, and was able to name the president and the previous president, as well as the sheriff of her county, and she was able to recite the alphabet. Dr. Goff noted that, during the examination, the claimant was able to understand, follow, and carry out simple and some complex instructions. He opined that she cannot remember instructions for more than a few minutes or in regard to any tasks which are difficult. He opined that she would be seen as slow and prone to error by supervisors, coworkers, and others and her ability to deal with the stresses and pressures of the workplace is an academic issue at this point. He concluded by saying that she is functioning within the mildly retarded or intellectually disabled range. He diagnosed the claimant with dementia, secondary to closed head injury, organic amnestic disorder, and rule out mental retardation mild (Exhibit 11 F, P. 3-6). The undersigned does not concur with Dr. Goff's opinion because it is inconsistent with the evidence as a whole, including the opinions of Dr. Tocci and Dr. Reynolds and the psychologist expert witness, Dr. McKeown.

Dr. Goff also completed a Medical Source Opinion Form (Mental). He opined that the claimant has moderate limitations in her ability to understand simple instructions, in responding to customary work pressures, using judgment in simple one or two step work related decisions, and in maintaining activities of daily living. Here, moderate is defined as being more than a slight limitation in this area, but the individual can still function satisfactorily. He opined she has marked limitations in: understanding detailed or complex instructions, carrying out simple, detailed, and complex instructions, remembering simple, detailed, or complex instructions, responding appropriate to coworkers, supervisions, customers, and the general public, dealing with changes in routine work settings, using judgment in

detailed or complex work-related decisions, and her constriction of interests. He lastly opined that she has an extreme limitation in maintaining attention, concentration, or pace for periods of at least two hours (Exhibit 11F, P. 8-9). Marked and extreme limitations indicate substantial loss to no useful ability to function in the area of concern.

After the first hearing, on January 8, 2014, she attended a consultative examination conducted by Walid Freij, MD, a neurologist. She reported chronic headaches since her car accident in 1993, with head trauma and concussion, with a coma for 5 days, and described the pain as throbbing in nature associated with photophobia phonophobia. Interestingly, she remembered that her husband was driving, she was a front seat passenger with her seatbelt on, and they were hit by another car on the driver's side. Her husband and two passengers in the back seat, plus the driver of the other car, were killed. However, she said she does not remember all of the details of the accident. She also reported having pain and numbness in her hands since the accident in 1993, but no weakness, <u>but with bilateral fractures of her wrists</u>. Physical examination indicated that her blood pressure was 117/94 and she was in no acute distress. Her cervical spine was normal, no limitations, as was her lumbar spine; she did not use an assistive device. She was alert, and oriented times 4. She <u>had slight</u> tenderness noted over the wrist, with no swelling. Her cranial nerve examination was unremarkable and she had 5/5 motor power throughout, an unremarkable gait. She had a NCS/EMG of both upper extremities, which was normal; it did not show any evidence of carpal tunnel syndrome, cervical radiculopathy or peripheral neuropathy affecting the upper extremities, and no evidence of denervation; this meant that her reported hand pain was likely related to the fractures she reported from the car accident. His assessment is apparently based upon the claimant's self report of her injuries from the motor vehicle accident. Dr. Freij opined that based on the physical examination and the above history she gave, the claimant would have difficulty maintaining a productive job because of her chronic headaches. He opined that this car accident event has affected her life markedly, causing her to feel depressed, and she would be limited in terms of carrying and lifting due to pain in her wrist secondary to the

fractures she had during the accident. He lastly opined, however, that she is able to stand, walk, hear, speak, and travel (Exhibit 12 F, P. 2, 3-4, 5-8).

Dr. Freij also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) the same date. Noting her hand pain complaints, he opined that the claimant can frequently lift and/or carry up to ten pounds and occasionally up to twenty pounds. She can sit eight hours at one time and for a total of 8 hours in an eight hour workday. She can stand four hours at one time and five hours in an eight hour workday. She can walk four hours at one time and for five hours in an eight hour workday. She can occasionally reach (including overhead), handle, and push/pull bilaterally. She can frequently finger bilaterally. She can continuously use her feet for foot controls bilaterally. She can frequently climb stairs, ramps, ladders, scaffolds, balance, stoop, kneel, and crouch and can occasionally crawl. She can frequently tolerate exposure to unprotected heights, moving mechanical parts, loud noises, and operate a motor vehicle. She can occasionally tolerate exposure to humidity, wetness, pulmonary irritants, extreme cold, and extreme heat. Her hearing and vision are unaffected by any of the impairments, and she can perform activities like shopping, travel without the assistance of a companion, ambulate without an assistive device, walk a block at a reasonable pace, prepare a simple meal and feed herself, handle her personal hygiene, and she can sort, handle and use paper files (Exhibit 12 F, P. 9-14). I would note, however, that the objective medical evidence from the nerve conduction studies/ EMG report would not support any significant hand restrictions, nor the clinical observations made at the time he saw her.

On April 7, 2014, at the request of the administration, she attended a consultative examination conducted by Richard Reynolds, PhD, a psychologist. The claimant reported headaches (which occur approximately every other day), hands giving out, left leg inflammation, arthritis pain in her arms, and memory loss. For the first time in this record, she reported seeing someone for anger issues as a child in Virginia. As for her MVA in August 1993, she reported that she was in the hospital for 12 and 1/2 weeks [the record only supports Aug. 15-Sep 14, 1993] following the MVA and

with memory problems since the accident, except for household chores, which she has no difficulties remembering. Her medical history was reported as hypertension and arthritis. She reported quitting school in the 10th grade due to pregnancy, and indicated that she was in regular education classes (not special ed). She reported living with her daughter, granddaughter and 18 year old son in an apartment in Demopolis, Alabama. Exhibit 13 F, P. 2, 3-4. Mental status examination indicated she was well-nourished and well-developed, alert and oriented times 4. Her recent memory was good, as demonstrated by her recall of recent meals. Her speech was within normal limits for rate and flow. She described her mood as "up and down". Her affect was euthymic (which means normal), and she demonstrated appropriate concentration and attention. Her fund of information was consistent with borderline intellectual functioning. Her thought process was tight and her thought content was logical. Her judgment and insight were appropriate for her level of intellectual functioning. She reported that she typically eats meals, 4 per day, and she and her daughter do the cooking and grocery shopping. She manages her own finances and does her activities of daily living (ADLs) without assistance. When she awakens she takes her medication, drinks coffee and eats breakfast, and after breakfast she takes another medication. She will get up when her daughter comes home and walks to the store, comes back home and watches TV. She is a member of a church. Dr. Reynolds administered the WAIS-IV to the claimant, and she obtained a full scale IQ score of 75, with verbal comprehension of 76, perceptual reasoning of 71, working memory of 77, and a processing speed of 100. Wide Range Achievement Test, 3d Edition (WRAT-III), test scores indicated the claimant to have a 6th grade reading and spelling ability and a 5th grade arithmetic ability. Dr. Reynolds diagnostic impression was borderline range of intellectual functioning, and he found her to be basically literate. He noted that the claimant's reported information regarding daily functioning and forgetfulness in the home was not consistent with her presentation during his evaluation. Exhibit 13 F, P. 4-5. He further noted that she reported that her daughter was in college and that she took care of her six year old granddaughter while her daughter attended school (Exhibit 13 F, P. 6). Dr. Reynolds was

aware of Dr. Goff's evaluation, previously discussed, and that he had indicated marked deficits in many areas; however, he (Dr. Reynolds) did not find any marked deficits in the claimant's daily functioning. In contrast, Dr. Reynolds found the claimant to be a lucid individual who is quite verbal and quite fluent, and who was able to remember her recent meals, trip to the examination and (other) recent events. She was able to provide extensive historical information, including dates and specific information concerning these events. In his opinion, she was capable of managing funds. The undersigned concurs with Dr. Reynolds's assessment and opinion, because it is consistent with the evidence as a whole.

Dr. Reynolds also completed a Medical Source Statement of Ability to do Work-Related Activities (Mental). He opined that the claimant has no more than mild limitations in her ability to carry out, understand, and remember complex instructions, with no other work related limitations (Exhibit 13 F, P. 7-8). Here, "mild" is defined as, "There is a slight limitation in this area, but the individual can generally function well", which is defined the same way in Goff's material. See, Exhibit 11 F, P. 8.

In a letter addressed to the Mr. Coplin, on May 15, 2014, Dr. John Goff addressed the differences between the scores he obtained on the claimant's WAIS-IV assessment and the scores of Dr. Reynolds. He asserted that the differences in the IQ scores have to do with a practice effect, which he maintains is well documented in the articles he included, and the possibility that there may have been some other source of variance perhaps error in this one very substantial outlier subscale and outlier index score. He pointed out that his diagnosis in the case was for dementia secondary to a closed head injury, because of historical information and other aspects of the evaluation besides the intellectual assessment. He suggested that the record, including his entire evaluation, rather than just the IQ scores, be considered in evaluating the case (Exhibit 14 F, P. 1-2). The article, written in 2009, which I have read, which Goff referred to, appears attached to the letter, at Exhibit 14 F, P. 4-16, with references to support the article at P. 16-19. However, even this article notes that practice effects appear to have less of an impact on

individuals with lower IQs than for individuals with higher IQs, Exhibit 14 F, P. 11, which only makes common sense. The article notes that less information is available to assess the practice effects of repeated administrations of the WAIS-IV, but the available information for the WAIS-IV dealt only with retest intervals of 8-82 days, with a mean interval of 22 days, not 6 months (180 days) later, as in the present case. Moreover, the article notes that the WAIS-IV reduces time bonuses on Arithmetic and Block Design items, which the article indicates to be useful in reducing the tendency of performance items to be positively affected (increase scores) by practice effects. Exhibit 14 F, P. 8. As a result, the practice effects, and to what extent, the actual effect, of a retest of the WAIS-IV 6 months later are not clear, if any. Most of the test-retest studies for all IQ instruments involved relatively short timeframes for the retest, with practice effects which were most evident within short time frames (less than 3 months, or 8-82 days), with smaller gains expected on intervals of longer duration. Many of the studies cited involved retest periods of two weeks or up to 30 days or less. Retest intervals that are relatively long, over 6 months, however, do not permit the test taker to remember most aspects of the test's contents, which in turn reduces the magnitude of the practice effect, if any. Exhibit 14 F, P. 11. The attached abstract is irrelevant to this case, as the 54 participants studied there have a median age of 20.9 years, a median education level of 14.9 years (a high school plus 2 –3 years of college education), and initial Full Scale IQs of 111, see Exhibit 14 F, P. 3, and those demographics do not fit the present situation, as the claimant is not a younger individual in the sense that at the time of test taking she was not a twenty something year old person, her education level is either as a 10th or 11th grade drop out, and her highest tested IQ is in the FS=75 Borderline range, not initial Full scale IQs in the area of 111, which is an average to higher than average IQ. The article mentioned has already made the point that practice effects have much less of an impact for those of lower IQs, and here the claimant has a substantially lower IQ than the individuals studied. Exhibit 14 F, P. 11. This is sort of like comparing apples to oranges, which suggests intellectual dishonesty. Taking all of this into consideration, I find Dr. Goff's representations and conclusions of the claimant's abilities

misleading at best, and certainly not credible nor accurate as applied to this claimant. As Dr. McKeown testified, Dr. Reynold's WRAT results were another objective testing instrument which did tend to show, provide evidence and support, that the claimant was at the Borderline Intellectual Functioning level, and that she was not testing nor presently functioning at the mentally retarded level.

Taking all of these points into consideration, I do not find compelling reason or evidence to conclude that this claimant's performance when she took the WAIS-IV under Dr. Reynolds is significantly subject to question, at least not by the preponderance of the evidence. The psychologist expert witness, Dr. McKeown felt this way, and he noted the claimant's WRAT scores were consistent with the WAIS-IV scores in indicating Borderline Intellectual Functioning. I would point out that after her interview Dr. Tocci, a psychologist, thought the claimant to be of average intelligence, and, before the test was given, Dr. Reynolds thought she was in fact borderline intellectual functioning. Of course, it is well known that an individual can always score less than one's true abilities on an IQ test, due to test taking behavior, motivation, whether one is tired, or whether one is affected by some medication, etc., but one can never score higher than one's true abilities. Moreover, IQ scores alone are not dispositive when assessing intellectual ability, as one's adaptive functioning must always be taken into account. Here, it is noted that the claimant has raised a family (two children) and done all the things appropriate to do so over a long period of time (20 years or more). Mentally, she has lead a normal life, not unlike everyone else; she shops, or has shopped, in stores, walks where she wants to go, cooks full meals, watches TV, uses the telephone to communicate, and she takes her prescription medications as directed, without memory problems, just to give a few examples. She goes to the doctor when she deems it appropriate to do so, and takes care of her 6 year old granddaughter in her daughter's absence attending college. She presently handles, and has handled, her own finances, can pay bills, count change, and handle a checking and savings account. She makes snacks, sandwiches, and has cooked complete meals in the past, without assistance. She can cook using recipes, which she reads. Exhibit 6 E, P. 5-6 and testimony.

For the above and foregoing reasons, I find that this claimant is Borderline Intellectual Functioning, and perhaps, as Dr. Tocci noted, she is higher than that. There is no credible evidence that she was mentally retarded prior to the age of 22, nor does she meet the listing of 12.02, based upon the totality of the evidence, including the psychologist expert testimony by Dr. McKeown. I am not satisfied that she has had any significant decline in intellectual abilities, and there is no history of IQ testing from earlier periods to use to establish a baseline, in any event. The available records and her testimony indicate that she was in regular public education classes, and that she dropped out of school as a result of getting pregnant with her first child, her daughter, while in either the 10th or 11th grade of high school. There are no IQ scores prior to age 22 to consider, so there is no IQ evidence prior to age 22. There are, indeed, no indications in Dr. Fitzgerald's notes, from his clinic, to suggest the claimant is mentally challenged, and they consistently show that she was not depressed, not anxious, was alert and oriented when he or his staff saw her. She has been and is given or prescribed medications by this clinic, with no indication that she has any difficulty administering them to herself, as directed. This brings into serious question Dr. Goff s assessment of her work related abilities, and I find that it is not credible or worthy of acceptance, as I find that it is simply invalid, when all of the other evidence is considered, and it is accordingly rejected. It is noted that his assessment was bought and paid for by the claimant 's attorney, shortly before our first hearing, after all of the physical medical evidence had been obtained, though I just note that in passing, as a for what that is worth, as it is not a primary reason for rejecting his opinion, which has been pretty thoroughly discussed. Again, it is interesting that it was submitted just prior to the first hearing, after the physical medical record was more or less complete.

Lastly, some nine months after her last visit to the Dr. Fitzgerald clinic, on July 11, 2014, she returned to Fitzgerald and Perret for complaints of having headaches, and reported that the medication was no longer working. Again, she did not at this time have facial or sinus pain, no neck symptoms, no neck pain, and no photophobia. She had no muscle aches, no localized joint pain, no localized

29

joint stiffness, no dizziness, no vertigo, <u>no anxiety and no depression</u>. She appeared well nourished, and in no acute distress. Her back was normal and the overall findings for her musculoskeletal system were normal. She was oriented to time, place and person. Her physical examination was unremarkable, but she was injected with Depo-Medrol 80 milligrams for her headache, which she tolerated well and was also given prescribed medications (Exhibit 15 F, P. 2, 3-5). Her hypertensive prescription medications included Norvasc 10 mg, to be taken twice a day, Catapres .02 mg, 1 at bedtime, and Inderal LA 8- mg, taken twice a day. For her headaches, she was also prescribed Soma, 350 mg, to be taken twice a day, Norco, 7.5-325 mg, once per day, and Amitriptyline HCI 100 mg, to be taken at bedtime. She was given counseling and instructions re the use of the medications and counseled to cease smoking, just as she had been similarly instructed before by clinic staff. See, e.g., Exhibit 9 F, P. 3,18, 22; 1 F, P. 6,15.

As for credibility, the undersigned finds that the claimant's statements regarding her impairments are at best only partially credible. The evidence in the record indicates the claimant's functional limitations are not as significant and limiting as has been alleged by the claimant. As discussed above, prior to her onset date she had several surgeries due to a motor vehicle accident, which certainly suggests that the symptoms at that time were genuine. While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms. The evidence indicates that her follow up treatment was unremarkable and she did not seek any significant treatment for well over fourteen years (2008). However, when she did seek treatment in 2011 it was for right foot pain that she sustained after hitting it on a chair. It was only some ten months later in June 2012 that she complained of an injury to her head and right arm while trying to break up an altercation, and then in July 2012 she complained of a headache at the staple site of the head injury, and reported that the headaches were lingering. Around November 2012, she complained of headaches and reported they were on the right side where she had the head injury in June 2012; she reported she has been

having headaches since her accident in 1993, but this is not supported by the record prior to July of that year (2012), and this negatively affects her credibility (Exhibit 9 F). There is no documentation of reported headaches until July 2012, which is almost nineteen years later. Although, the evidence indicates that she has continued to be treated with a headache syndrome, she has denied dizziness, vertigo, fainting, motor disturbances, and sensory disturbances. There has been no evidence of radiating pain and her cervical spine evaluations have been consistently unremarkable. When examined by Dr. Freij, her physical and neurological examinations were unremarkable and he noted she did not have any facial weakness or asymmetry (Exhibit 12 F). Furthermore, the evidence does not document a head computed tomography (CT) associated with or establishing evidence of headaches and her treatment has been essentially routine and conservative in nature, with medication management.

Regarding the claimant's history of arthritis, the evidence indicates complaints of wrist and some knee pain. At the second hearing, she testified she has been wearing wrist splints on and off for the last twenty years [however, where does this appear in the medical record?], and that she can only lift a five pound bag of potatoes. However, the evidence shows, indicates she recently underwent a NCS/EMG of the upper extremities, which revealed no evidence of carpal tunnel syndrome, cervical radiculopathy, or peripheral neuropathy affecting the upper extremities and there was no evidence of denervation (Exhibit 12 F, P. 5-8). Her clinic examinations have been unremarkable with normal gait and no deformities, edema, crepitus, clubbing, or cyanosis of the extremities. There were no neurological deficits noted and her musculoskeletal examinations has been unremarkable with normal range of motion of all joints and 5/5 motor strength bilaterally. Again, the claimant is alleging that her pain stems back to her accident in 1993. As stated above she did not seek treatment for over fourteen years, at least not any that is of record, and interestingly Dr. Wardell opined in November 1993, that her right wrist fracture had healed and there was no permanent physical impairment anticipated (Exhibit 8F, 2). What is more, the claimant reported falling while hanging a picture (Exhibit 9 E, P. 2). Indeed, someone with wrist problems,

chronic headaches, and arthritis pain would certainly not be reaching overhead to hang a picture if all of that was true. Furthermore, there are no x-rays suggesting that the claimant has any form of arthritis at the present, and her musculoskeletal examinations have been unremarkable, with normal range of motion of all joints, no joint stiffness or pain reported at her clinic.

In addition, the undersigned notes that the claimant was listed once or twice with an indication of diabetes mellitus, in clinic records, but this must be a mistake, as the claimant receives no treatment for this, she did not list it as an impairment, and has reported no symptoms for this, though once she was concerned about her blood sugar levels, which actually were normal (Exhibit 1 F, P. 17); however, this indication must be related to her report that someone in her family had it, and is simply a mistaken entry.

In regards to the claimant's cognitive disorder, suggestion of depression, and borderline intellectual functioning, the evidence indicates the claimant has not received any mental health treatment in the last 20 years, nor has there been any emergency room treatment, for a mental disorder. In clinic records, she has consistently denied depression up to the present. As stated above, she was treated for a concussion in 1993 and when examined by Dr. Tocci in September 2012 she did not report any mental impairment; she only reported a massive head injury she sustained in 1993. The claimant had an unremarkable mental status examination and Dr. Tocci noted that she appeared to be functioning within the average range of intellectual ability. She did not diagnose the claimant with a mental impairment, but assessed her with a pain disorder and a GAF of 60, which would reflect only moderate symptoms. Dr. Tocci opined that the claimant appeared to have the cognitive ability to engage in work-related activities (Exhibit 2 F). Some year and a half later, in April 2014, she was examined by Dr. Reynolds and reported memory loss along with some physical impairments. However, Dr. Reynolds thoroughly examined the claimant and, after IQ and WRAT testing, diagnosed her with borderline intellectual functioning. He noted she demonstrated appropriate concentration and attention. Her fund of information was consistent with borderline

functioning. Her thought process was tight and her thought content was logical. He further noted her judgment and insight were appropriate for her level of intellectual functioning. Dr. Reynolds administered the WAIS-IV to the claimant, for which she obtained a full scale IQ score of 75. He noted that the claimant's reported information regarding daily functioning and forgetfulness in the home was not consistent with her presentation to him during the evaluation. He further noted that she is able to care for her six year old granddaughter while her daughter attends college. Furthermore, Dr. Reynolds opined that the claimant does not have any limitations with understanding, remembering, and carrying out simple instructions (Exhibit 13 F).

In conclusion, the undersigned finds that the symptoms and limitations that the claimant has provided throughout the record have generally been inconsistent and unpersuasive. The claimant testified she cannot work due injuries she sustained in 1993. Interestingly, the evidence documents treatment for her sustained injuries in 1993-1994, but which demonstrate that she was healing properly. The undersigned notes that the claimant has received various forms of treatment and past surgeries for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor; however, the record reveals that the treatment and surgeries were very successful in addressing those symptoms, which are now 20 years old. The overall medical record that are available suggest that the claimant's treatment history is inconsistent with what one would expect for a totally disabled individual and that her alleged impairments would not preclude work. Accordingly, the undersigned finds that the claimant's allegations are not credible to the extent that they are inconsistent with the above residual functional capacity.

The claimant has described daily activities, which are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant reported the following daily activities: waking up, cooking breakfast, making her bed, taking a bath, getting

dressed, doing housework, selecting dinner for the night, watching television, taking a walk, cooking and eating dinner, reading a little, then going back to sleep. She reported she can attend to her personal care independently, although it is hard for her to button her blouses and jeans and comb her hair. She can clean, iron, perform laundry duties, and wash dishes. She shops in stores and can handle financial obligations. She also reported she has cared for and cares for her children and grandchildren (Exhibit 6E). However, at the hearing she reported that now she and her daughter clean the house and shop together. Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The undersigned has assigned great weight to the findings of Dr. Richard Reynolds and Dr. Nina Tocci, in accordance with 20 CFR 404.1527. The undersigned notes that Drs. Reynolds's and Tocci's opinions are consistent with the overall records and reports obtained from the claimant's treating physicians and with the evidence as a whole. The undersigned also notes that Dr. Tocci did not diagnose the claimant with a mental impairment; however, she assessed her with a GAF of 60, which indicates only moderate symptoms (Exhibit 2 F). The undersigned further notes that Dr. Reynolds diagnosed the claimant with borderline intellectual functioning; however, Dr. Reynolds opined that the claimant can understand, remember, and carry out simple instructions (Exhibit 13 F). In addition, the record does not indicate any mental health treatment or psychotropic medication for mental disorder. The undersigned notes that Dr. Reynolds's and Dr. Tocci's opinions are consistent with records and reports obtained from the claimant's treating physicians and with the overall evidence as a whole. Therefore, pursuant to 20 CPR 404.1527(d)(l) and 416.927(d)( 1), the undersigned gives great weight to the opinions of Dr. Reynolds and Dr. Tocci, as an examining physician/psychologist.

The undersigned has also considered the opinion of Dr. McKeown in accordance with 20 CPR 404.1527. The undersigned notes that Dr. McKeown's opinion is consistent with records and reports obtained from the claimant's treating physicians and with the evidence as a

whole, except, of course, for Dr. Goff s opinions. While it is noted that Dr. McKeown is a non- examining source, he is however a Licensed Clinical Psychologist and a medical expert for the Social Security Administration. As such, Dr. McKeown possesses an extensive understanding of the disability programs and their evidentiary requirements, especially for the mental listings, including listings 12.02 and 12.04. In addition, Dr. McKeown had the benefits of reviewing the entire record and being present throughout the claimant's testimony at the second hearing, and he was subject to cross-examination by the claimant's attorney. Therefore, pursuant to 20 CPR 404.1527(f), the undersigned gives great weight to the opinion of Dr. McKeown.

In addition, the undersigned has also considered the opinion of Dr. Freij in accordance with 20 CPR 404.1527. In this case, no treating physician has offered an opinion sufficient upon which to assess the claimant's residual functional capacity. However, the undersigned notes that Dr. Freiji's opinion is consistent with records and reports obtained from the claimant's treating physicians and with the evidence as a whole. In addition, Dr. Freij is a specialist in Neurology and is also Program medical expert. Pursuant to 20 CPR 404.1527(d)(5) and 416.927(d)(5), we generally give more weight to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist. Therefore, pursuant to 20 CPR 404.1527(d)(l) and 416.927(d)(l), the undersigned gives significant weight to the opinion of Dr. Freij as an examining physician, except as to his hand limitations, which I find are not supported by the objective NCS/EMG studies of the claimant's hands, which indicated no objective evidence for her pain complaints for her hands. His limitations regarding her hands can only reflect her subjective hand complaints of pain, as he noted no history of weakness and only slight tenderness noted over the wrist, no mention of the use of wrist splints. He did indicate that she could frequently lift and carry 10 pounds and occasionally lift and carry 20 pounds, despite her pain in her wrists. Exhibit 12 F, P. 2, 3, 9. No findings were identified or listed to justify her hand limitations. See, Exhibit 12 F, P. 11. The claimant's headache complaints are difficult to assess objectively, and are inherently

subjective in nature, but I assess mild to moderate pain to account for this complaint.

In addition, as explained before, the undersigned rejects the assessment of Dr. Goff (Exhibit 1IF). It is emphasized that it appears the claimant underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Further, the doctor was most certainly paid for the report. Although such evidence is certainly legitimate in the technical legal sense and must be given due consideration, the context in which it was produced cannot be entirely ignored. The doctor's opinion is without substantial support from the other evidence of record, which obviously renders it less persuasive. The record does not contain any opinions from treating or examining physicians or other consulting psychologists indicating that the claimant is disabled or even has limitations greater than those determined in this decision. Furthermore, it appears that Dr. Goff apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Therefore, the opinion expressed is quite conclusory, providing very little legitimate explanation for disagreement with the overall evidence, and it is therefore rejected.

**5. The claimant has no past relevant work (20 CFR 416.965).**

**6. The claimant was born on June 17, 1966 and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**

**7. The claimant has a limited education but is able to communicate in English (20 CFR 416.964).**

**8. Transferability of job skills is not an issue because the claimant does not have any past relevant work (20 CFR 416.968).**

**9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).**

* * *

**10. The claimant has not been under a disability, as defined in the Social Security Act, since June 14, 2012, the date the application was filed (20 CFR 416.920(g)), through the date of this decision.**

(Tr. 18-41).

## V. DISCUSSION

A claimant is entitled to an award of SSI benefits if the claimant is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than 12 months. *See* 20 C.F.R. § 416.905(a). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

(1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC

> to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against

the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Clayton has asserted two grounds in support of her argument that the Commissioner's decision to deny her benefits is in error. The Court will address Clayton's contention that the ALJ conducted a flawed credibility determination first and, then, the allegation that the ALJ erred in assigning weight to the medical opinions.

## A.  ALJ Conducted a Flawed Credibility Determination

In his decision, the ALJ found Clayton's statements regarding her impairments to be "at best only partially credible," and her functional limitations to not be "as significant and limiting as … alleged by [Clayton]."  (Tr. 35). Clayton contends that the ALJ conducted a flawed credibility determination by incorrectly interpreting testimony and evidence, and thus, his finding is not supported by substantial evidence. Clayton bases her contention on several factual findings made by the ALJ that she alleges were misrepresentations of the evidence. First, she claims that the ALJ found her credibility was diminished by a lack of treatment records "for well over fourteen years." Clayton intimates that there were treatment records for that period and claims the missing treatment records were simply not entered into evidence. She further argues that it was the ALJ's responsibility to seek out those records if he felt they were relevant. (Doc. 19 at pp. 10-11). While the ALJ has a "basic obligation to develop a full and fair record," *see Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997), it is also well-established that the claimant bears the burden of proving disability and is,

therefore, responsible for producing evidence in support of her claim, *see Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003). Moreover, although Clayton indicates that such records exist and were simply not entered into evidence, she offered no support for her statement and has had ample opportunity to produce those documents to provide support for her intimation that records do exist.

In his decision, the ALJ made the observation about Clayton's questionable credibility after noting the fact that, prior to her onset date in this case, which was June 14, 2012, Clayton had several surgeries due to a motor vehicle accident. Normally this circumstance would weigh in the claimant's favor, but in this case,  the ALJ concluded the impact was "offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." (Tr. 35). He further noted that "[t]he evidence indicates that her follow-up treatment was unremarkable and she did not seek any significant treatment for well over fourteen years ([until] 2008)." (*Id.*).  He continued to note that medical records in 2011 and 2012 indicated that the symptoms of which she complained on those visits arose from circumstances other than the 1993 motor vehicle accident. (*Id.*). However, as noted by the ALJ, on November 26, 2012, Clayton went to her family physician's office complaining of a headache on the right side of her head, which was where she had 22 staples for a head injury she suffered while trying to break up an altercation in June of 2012.

At this visit, she claimed that she had been having headaches since her accident in 1993. (*Id.*) According to the records produced by her family physician's office, prior to the November 26, 2012 visit, Clayton did not mention

that she had been having headaches since the 1993 accident even though she had been treated at that office since 1995 and on several occasions earlier in 2012. (Tr. 323-43, 394-429). The ALJ found that her claim that she had been treated for headaches since the 1993 motor vehicle accident was not supported by the record. He opined that such a statement negatively affected her credibility because there was no documentation of reported headaches until June of 2012, almost nineteen years after the motor vehicle accident, when she was involved in breaking up an altercation. (*Id.*). This Court finds that there is substantial evidence supporting the ALJ's finding.

Clayton also argues that the ALJ misrepresented statements she made to doctors and in the Function Report in analyzing her credibility. In his decision, the ALJ stated that Clayton "takes her prescription medications as directed, without memory problems, …" (Tr. 34) and cited the Function Report. However, Clayton points out that, in the Function Report, she wrote that she needs "constant reminders" to take her medications. Clayton contends the ALJ erred by pointing out things she said she can do in the Function Report, but omitted to mention that she said in that same Function Report that her daughter helps her cook, clean, and take care of other household tasks. The Court notes that the ALJ did acknowledge that Clayton testified that her daughter helps her with certain tasks. Finally, Clayton argues that the ALJ erred by raising credibility questions based upon her giving varying accounts of her recollection of the accident and the length of time she was in a "coma" to various doctors.

Even assuming *arguendo* that the ALJ misinterpreted some of the

evidence, the ALJ provided several other valid reasons for discounting Clayton's allegations of disability. Clayton's argument that the ALJ incorrectly assessed her credibility fails initially because she largely ignores the reasons the ALJ provided for discounting her allegations of disability and the evidence supporting those reasons. As to Clayton's argument that the ALJ misrepresented statements concerning her activities of daily living in making a credibility determination, the ALJ's decision shows that he did not just consider the few statements described by Clayton, but statements made by Clayton as a whole. *See Fralix v. Colvin*, No. 0:13-1211-TMC, 2014 WL 3784335 (D.S.C. Aug. 1, 2014) ("Even assuming the ALJ failed to properly develop the record on the issue of Fralix's inability to afford treatment, any error committed by the ALJ in his noncompliance analysis is ultimately harmless, given the remainder of the ALJ's credibility analysis."); *Tench v. Colvin*, No. 6:13-cv-595-RBH, 2014 WL 3889111 (D.S.C. Aug. 8, 2014) (noting that one of the ALJ's reasons for discounting the plaintiff's credibility may have been improper, but holding "even assuming the ALJ erred in considering this evidence, such error was harmless as the ALJ gave numerous valid reasons for discounting the plaintiff's credibility") (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). The ALJ appropriately concluded that Clayton's complaints of disabling symptoms were not entirely credible because they were inconsistent with 1) other evidence of record, including the medical opinions of Drs. Tocci, Reynolds, Freij, McKeown, Wardell, and Rahman; 2) her lack of treatment and long gaps in treatment for allegedly disabling impairments; 3) her conservative course of treatment; 4) her normal or generally normal physical and mental

examination findings; 5) the lack of imaging studies supporting her complaints; 6) her nerve conduction and EMG studies showing normal functioning and no impairment; and 7) her activities of daily living. (Tr. 35-37).

"A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Davis v. Astrue*, 346 F. App'x 439, 440 (11th Cir. 2009) (quoting *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995)). This is so even if some of the reasons for questioning the claimant's credibility stated by the ALJ are suspect. *See id.* at 441 (reversing the District Court's reversal of the ALJ's decision denying benefits because it found that the inconsistencies between the objective medical findings and the claimant's subjective complaints of pain, which were pointed out in the ALJ's decision, constituted substantial evidence supporting the ALJ's determination). Accordingly, even if some of the reasons the ALJ stated to support his credibility are suspect, the conclusion reached by the ALJ that Clayton was only partially credible was supported by substantial evidence and was not in error.

**B. ALJ Erred in Assigning Weight to the Medical Opinions**

Clayton asserts that the ALJ erred in assigning weight to the medical opinions of Dr. Goff, Dr. Tocci, Dr. Reynolds, and Dr. McKeown, the four psychologists who rendered opinions in this case. The ALJ gave great weight to the opinions of Dr. Tocci, Dr. Reynolds, and Dr. McKeown. Clayton asserts that he should not have given great weight to the opinions of Dr. Tocci and Dr. Reynolds because their opinions are not consistent with each other and not

consistent with the other evidence of record. She argues that because Dr. Tocci gave a guarded prognosis and Dr. Reynolds gave a good prognosis, their opinions are not consistent. She did not explain how their overall opinions were not consistent with the record. Clayton asserts that the ALJ erred in giving great weight to the opinion of Dr. McKeown because he was a non-examining psychologist and only offered expert testimony at the hearing; therefore, he should have been given no more weight than any other non-examining physician, pursuant to 20 C.F.R. 404.1527(f). Finally, Clayton's primary argument is that the ALJ erred by rejecting Dr. Goff's opinion when he should have given Dr. Goff's opinion more weight than the opinions of the other psychologists because he is a board certified neuropsychologist and, therefore, "more qualified than any of the other three psychologists." (Doc. 19 at p. 8). Clayton did not address the inconsistencies in Dr. Goff's testimony that were pointed out by the ALJ, but argued that his "opinion is clearly supported by his own objective testing." (Doc. 19 at p. 9). The Commissioner asserts that the ALJ provided valid reasons for the weight accorded the doctors' opinions, that those findings are supported by substantial evidence, and that the ALJ's evaluation of their opinions is entitled to deference.

The relevant social security regulations provide that medical opinions are weighed by considering the following factors: 1) whether the source of the opinion examined the claimant; 2) whether the source treated the claimant and, if so, a) the length of the treatment relationship and the frequency of examination and b) the nature and extent of the treatment relationship; 3) the supportability of

the opinion with relevant evidence and by explanations from the source; 4) the consistency of the opinion with the record as a whole; 5) whether the opinion was offered by a specialist about a medical issue related to his or her area of specialty; and 6) any other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Nichols v. Comm'r, Soc. Sec. Admin.*, No. 16-11334, 2017 WL 526038, at * 5 (11th Cir. Feb. 8, 2017) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)) (stating that "[i]n determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization").

In the instant case, the ALJ provided an **extensive** review of the medical evidence, as well as Clayton's testimony and written details concerning her daily activities and history, in his Decision. Based on this extensive review of the records and testimony, the ALJ accorded great weight to the opinion of Dr. Tocci (an examining consultative psychologist), rejected the opinion of Dr. Goff (an examining neuropsychologist retained by Clayton's attorney two weeks before the first hearing), accorded great weight to the opinion of Dr. Freij (an examining consultative neurologist), except to his opinions that were based on Clayton's subjective complaints and not objectively supported, gave great weight to the opinion of Dr. Reynolds (an examining consultative psychologist), and gave great weight to the opinion of Dr. McKeown (a non-examining, reviewing medical expert).

With regard to Dr. Goff's opinion, the ALJ found: "The undersigned does

not concur with Dr. Goff's opinion because it is inconsistent with the evidence as a whole, including the opinions of Dr. Tocci and Dr. Reynolds and the psychologist expert witness, Dr. McKeown." (Tr. 30). The record reflects that Dr. Goff's opinion was also internally inconsistent. For example, Goff stated in his records that "[d]uring this examination she was able to understand, follow and carry out simple and some complex instructions," (Tr. 455), but in the Medical Source Opinion Form he completed on that same date, he stated that Clayton has moderate limitations in the ability to understand simple instructions and **marked** limitations in the ability to understand, carry out or remember detailed or complex instructions and **in the ability to carry out or remember simple instructions.** (Tr. 437). In addition, Dr. Goff opined that Clayton has moderate to marked limitations in the ability to maintain activities of daily living; however, Clayton's own written and oral testimony contradicts this conclusion. Also, based upon the same examination and testing, Goff concluded, within the same report, that Clayton was and was not mentally retarded. (Tr. at 433 and 435).

The ALJ supported his assessment of the weight to be given the various physician's opinions throughout his decision by citing 1) normal examination findings, including findings that Clayton had normal concentration and attention and adequate judgment and insight; 2) Clayton's lack of treatment for mental health issues; 3) the conservative course of treatment recommended by Clayton's treating physicians; 4) Clayton's reported activities of daily living; 5) Clayton's consistent denial of depression in the records of her family doctor; 6) the report of Clayton's application interview in which the interviewer stated that

Clayton had no difficulties with understanding, coherency, concentration, talking, or answering questions; and 7) conclusions from all of the doctors, except Dr. Goff that, while Clayton may be mildly to moderately impaired in some areas, she is not totally disabled. (Tr. 19-20; 24-39). Clayton's assertion that Dr. Goff's opinion should be given more weight because he is a specialist is not persuasive in light of the facts in the record in this case. "Generally, [the Comissioner] give[s] more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1). However, "an ALJ may reject any medical opinion if the evidence supports a contrary finding." *Nichols,* 2017 WL 526038, at *5 (citing *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985)); *see also Harris v. Comm'r Soc. Sec.,* 330 F. App'x 813, 816 (11th Cir. 2009) (holding that the ALJ did not err by rejecting the consultative psychologist's finding of severe impairment because the record evidence as a whole established that Plaintiff did not have deficits in adaptive functioning to meet Listing 12.05(D)).

Although the opinions of Dr. Tocci and Dr. Reynolds, both practitioners who examined Clayton, were not identical, their examination findings and relevant opinions were consistent. With regard to Dr. McKeown, the non-examining medical expert for the SSA, the ALJ's decision to give great weight to his opinion was supported by substantial evidence; namely, 1) his opinion was consistent with records and reports obtained from Clayton's treating physicians and the evidence as a whole (except for Dr. Goff's opinion), 2) as a Licensed Clinical Psychologist and medical expert for the SSA, he possesses an extensive

understanding of the disability programs and their evidentiary requirement, especially the mental listings, and 3) he had the benefit of reviewing the entire record and being present during Clayton's testimony at the second hearing. Clayton's criticism of the ALJ's giving weight to Dr. McKeown because he was a non-examining medical expert is misplaced. SSR 96-6p provides that, "[i]n appropriate circumstances, opinions from … psychological consultants … may be entitled to greater weight than the opinions of treating or examining sources."

"In assessing whether a claimant is disabled, an ALJ must consider the medical opinions in a case record *together with the rest of the relevant evidence received*." *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 870 (11th Cir. 2016) (citing 20 C.F.R. § 404.1527(b)) (emphasis added). "[T]he more consistent an opinion is with the record as a whole, the more weight the ALJ will give to that opinion." *Id.* at 871 (citing 20 C.F.R. 404.1527(c)(4)). The ALJ is to consider the claimant's daily activities when evaluating the symptoms and severity of an impairment. *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)). The ALJ does not have to give a treating physician's opinion considerable weight if the claimant's own testimony about daily activities contradicts that opinion. *Id*. (citing *Phillips v. Barnhart,* 357 F.3d 1232, 1241 (11th Cir. 2004)). If the claimant's own testimony regarding the claimant's daily activities contradicts the consulting physician's opinion, the ALJ's decision not to give the physician's opinion considerable weight is not in error. *See Chambers*, 662 F. App'x at 872. In this case, Dr. Goff's opinion was not in line with Clayton's own testimony or the record as a whole.

Based on the foregoing, the Court finds that the ALJ's opinion concerning

the amount of weight to accord each of the physician's opinions in this case was supported by substantial evidence and is not in error.

## CONCLUSION

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **26**th day of **June, 2017**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**